IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ROGER L SMITH, SR.,
           Plaintiff,

v.                                                    Civil Action No. 1:06CV104

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,
           Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB")

under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433,

1381-1383f. The matter is awaiting decision on Plaintiff's Motion for Judgment on the Pleadings

and Defendant's Motion for Summary Judgment and has been referred to the undersigned United

States Magistrate Judge for submission of proposed findings of fact and recommended disposition.

28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Roger L. Smith, Sr. ("Plaintiff") filed applications for DIB and SSI on March 11, 2004

(protective filing date), alleging disability beginning January 18, 1999, due to diabetes, high blood

pressure, high cholesterol, and back and vision problems (R. 60, 77, 90, 94, 386). Both applications

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

were denied initially and on reconsideration (R. 44, 270, 276). Plaintiff requested a hearing, which

Administrative Law Judge ("ALJ") Arthur L. Conover held on August 4, 2005 (R. 409). Plaintiff,

represented by counsel, was present and testified, as did Vocational Expert James Jones ("VE").

On October 27, 2005, the ALJ issued an unfavorable decision (R. 21). The Appeals Council denied

Plaintiff's request for review (R. 8), rendering the ALJ's decision the final decision of the

Commissioner.

## II. Statement of Facts

Roger L. Smith, Sr.("Plaintiff") was born on November 15, 1958, and was 46 years old at

the time of the administrative hearing (R. 21, 60). He completed the seventh grade and has past

work experience as a skidder for a logging company and as a well tender (R. 416).

On January 18, 1999, Plaintiff presented to the hospital with complaints of blurred vision

starting that day (R. 176). He was diagnosed with new onset diabetes.

On January 27, 1999, Plaintiff presented to the Vienna Eye Clinic for a vision test (R. 182).

His vision was 20/20 in the left and right eye. His blood sugar was 142 that day. It had been as high

as 420 (R. 184). His vision was currently much better. He was to continue with follow-up.

On January 28, 1999 a Certified Nurse Practitioner wrote that Plaintiff was unable to work

due to uncontrolled diabetes mellitus (R. 206). She noted Plaintiff had started medications, but the

diabetes affected his vision so that he could not drive. He needed to be off work for approximately

two months.

Plaintiff presented to a cardiologist on February 23, 1999 (R. 231). He was not hypertensive

and had no history of heart attack or stroke. He did have elevated lipids and diabetes. The

cardiologist opined that Plaintiff had recently diagnosed diabetes and significant hyperlipidemia.

2

He also may have had peripheral vascular disease although it did not look to be serious.

Plaintiff underwent a stress test on March 16, 1999 (R. 228). He tolerated the exercise study well.

On July 19, 1999, the vision clinic telephoned Plaintiff to arrange a follow up appointment (R. 183). Plaintiff's wife said that he was having tests done at the hospital and would call back.

Plaintiff underwent chiropractic treatment for back pain from March through July 1999 (R. 189). He also reported headaches and sinus trouble.

A cardiac evaluation in March 1999, was negative (R. 192).

On June 2, 1999, Plaintiff underwent x-rays of the sinus for his complaints of headaches and vertigo (R. 200). The studies were normal.

A July 30, 1999, MRI of the cervical spine was "relatively unremarkable . . . with no HNP, stenosis, or significant foraminal narrowing" (R. 187). It did show mild early disc desiccation at C4-5 and C5-6. An MRI of the lumbar spine for "low back and leg pain" showed "moderate to severe right L5-S1 foraminal narrowing that may explain right L5 symptoms." There was no significant left-sided abnormality, and no disk herniation or central canal stenosis. The doctor concluded there was no obvious anatomic explanation for Plaintiff's left lower extremity symptoms.

On August 20, 1999, Plaintiff's glucose was 151 (R. 196). His cholesterol was still high at 272 (R. 1950.

On October 1, 1999, Plaintiff presented to Saad U. Butt, M.D., for his diabetes and hyperlipidemia (R. 191). It was noted that Plaintiff was first diagnosed with diabetes in January of that year, when he had blurred vision and checked his glucose on his mother's glucometer. It was over 500. He was subsequently confirmed to have diabetes with glucose in the 400's. he was to

3

check his sugars more frequently, but did so only every other day. He took Glucophage 500mg twice a day. He reported his last fasting blood sugar was 118. His lipids had also been elevated since February. He tried to follow a low-fat diet but had not been very successful. He drank frequently on weekends, having about six beers over the weekend. His weight was stable and he felt "quite well except for generalized myalgias and arthralgias." He reported some dyspnea on exertion and left calf pain, but no chest pain. He reported chronic back pain. He said he slept poorly but was not depressed.

Plaintiff's physical examination that day was normal except for leukoplakia in the right lower buccal surface (R. 191). Plaintiff used one can of snuff per day. Dr. Butt advised Plaintiff regarding additional dietary changes and encouraged him to do more frequent blood sugar testing. He added Avandia to Plaintiff's Glucophage, Lipitor, Tricor, and fish oil. He advised Plaintiff to stop drinking alcohol and using snuff.

On October 29, 1999, Dr. Butt examined Plaintiff (R. 192). Straight leg raising was negative bilaterally. He diagnosed non-insulin-dependent diabetes, hyperlipidemia, and chronic low back pain. Dr. Butt found the diabetes was fairly controlled with medication and the hyperlipidemia showed significant improvement on medication, but Plaintiff's back needed further evaluation.

On November 16, 1999, Plaintiff was examined by Charles Paroda, D.O. for the State Disability Determination Service ("DDS") (R. 209). Plaintiff's chief complaints were back pain and diabetes. He complained of lower to mid back pain for several years, without radiation. It hurt to bend and stoop, and he was not sure what he could lift comfortably. It occasionally hurt to lie down. It did not hurt to sit or stand, but riding in the car for very long did hurt. It hurt to cough or sneeze, and was relieved by soaking in a hot tub. He went to the chiropractor for a while which helped, "but

4

quit seeing the chiropractor."

Plaintiff also reported his non-insulin dependent diabetes. He said his blood sugar usually ran between 120 and 140. He had fair control. He did get up four to five times a night to urinate. He had no end-organ damage, but complained of decreased vision. An ophthalmologist said there was no evidence of any retinopathy, however. Plaintiff specifically denied neuromuscular disease "including headaches, cerebrovascular accident or paralysis." He was taking Lipitor, Glucophage, Tricor, and Avandia. He last worked in 1997.

Upon examination, Plaintiff's blood pressure was 130/70 (R. 211). His visual acuity was 20/25 on the right and the left. He ambulated with a normal gait, without need for ambulatory aids. He was comfortable sitting, standing, and supine. His mental state and intellectual functioning appeared normal. Palpation of the shoulders, elbows, wrists, hands, hips, knees, ankles, and feet showed no swelling, tenderness, redness or warmth, and he had normal range of motion without any restrictions.

Plaintiff's spinal curvature was normal (R. 212). Palpation and percussion of the spinous processes revealed no tenderness, swelling or redness. The cervical spine showed normal range of motion without any restrictions. Plaintiff had "some tenderness" in the mid thoracic region with palpation. It did not extend to the lower back or neck. Straight leg raising was negative. He had normal range of motion of the neck and lower back, with "some discomfort" in the mid thoracic region. He could stand on his heels, toes, walk heel-to-toe, stand on one leg, and squat without difficulty. He could write his name, pick up coins, and perform fine manipulative testing.

Dr. Paroda found that Plaintiff had non-insulin dependent diabetes mellitus-stable, and chronic and acute back strain (R. 213). Plaintiff seemed "to be doing quite well with his

medication." He appeared to have a chronic low back strain, which at times became acute. There was no radiation. Otherwise his back was normal. He "appear[ed] to just have a back strain secondary to some possible arthritis." There was no radiculopathy. The remainder of the examination was within normal limits, and Plaintiff otherwise appeared to be healthy.

On December 8, 1999, Thomas Lauderman, D.O., a non-examining State agency reviewing physician, completed a Residual Functional Capacity Assessment ("RFC") of Plaintiff (R. 215). He opined that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, and could stand/walk about six hours in an eight-hour workday and sit about six hours in an eight-hour workday. He would have no postural, manipulative, visual, communicative or environmental limitations. Dr. Lauderman concluded that Plaintiff's RFC should be reduced to medium due to pain and fatigue.

On February 4, 2003, Plaintiff presented to his doctor, Phyllis Hammer, stating that he fell at work two weeks earlier and had neck and left shoulder pain since (R. 312). He complained of a headache in the back of his head and shoulder pain. The diagnosis was neck pain and left shoulder pain.

On March 17, 2003, Plaintiff presented to his doctor with complaints of headache, aching all over, and dry cough for two days (R. 311). His headache was in the front of his head. He was diagnosed with "febrile illness" and possible pneumonia, and told to go to the emergency room, but refused.

One week later Plaintiff said he was doing better, but his blood sugar was too high (R. 310). He had been off glucophage since he became ill. He was advised to restart his glucophage.

On March 27, 2003, Plaintiff informed his doctor he had been out of Lipitor for a couple of weeks (R. 310). He complained of a headache, but was not taking anything for it. Dr. Hammer

6

stated:

> Roger has been a very poorly controlled diabetic. At times his sugars will come more into line as well as his cholesterol values. At other times they are very elevated. This gentleman is very difficult to pin down as to how much of his medication he's missed. He'll say, "Oh, I missed a couple of doses, not too many." However, his triglycerides on this last lab study were 3,580 and he's been on Tricor and Lipitor both. He also is taking Actos 45 daily, Glucotrol 5 daily, Glucophage 500 two bid. He doesn't check his sugars. He states he does drink alcohol. "Some" were his words. He rubs Copenhagen. He doesn't have any chest pain or SOB but his feet do swell sometimes. He hasn't had any change in B&B habits. He is complaining of a headache. Generally it's in the back of his neck, the back of his head. He doesn't take anything for it. He just lets it pass.

During the physical examination, Dr. Hammer noted the smell of alcohol. She advised him to get his sugars in line or he would have to take insulin. Plaintiff responded "No, we won't do that." She also advised him to limit his alcohol intake.

On April 17, 2003, Plaintiff presented to Dr. Hammer for a routine followup (R. 308). He complained of shortness of breath when out in the heat; and dizziness with increased blood pressure. He did not check his blood sugars "too much." He had not had his Glucophage for a week.

On June 26, 2003, Plaintiff told Dr. Hammer he had some shortness of breath when exerting himself, especially in the heat (R. 307). He "hardly ever check[ed] his blood sugars." He was very poorly controlled. He had been out of Glucophage for a week and "has a history of not taking his medications on a regular basis. He does not take the diabetes very seriously." He complained that when his blood pressure was high he felt lightheaded. He was diagnosed with hypertension; hypercholesterolemia; hypertriglyceridemia; and diabetes.

On September 25, 2003, Plaintiff complained of a rash on his left hand and shortness of breath on exertion (R. 306). His diagnosis remained the same with the addition of dermatitis of the left hand. Plaintiff's labs had improved.

7

On December 18, 2003, Plaintiff complained to Dr. Hammer of "a hurting in his upper stomach area" for three to four weeks (R. 303). His blood sugar was running anywhere from 194-347. He used alcohol on a daily basis. The doctor advised him regarding diet and activity, telling him he was a candidate for insulin. She noted he had never met with the nurse educator before because he was always too busy working, but said he was "willing to do this now."

On December 30, 2003, Plaintiff complained of severe pain from sinus infection (R. 302).

On December 31, 2003, Plaintiff presented to the emergency room with complaints of sinus pain, cough, congestion, chills, and other flu symptoms for about two weeks (R. 239). He was diagnosed with acute sinusitis.

Also on December 31, 2003, Plaintiff presented to the hospital with complaints of right and left upper abdominal pain (R. 320). A CT scan showed the pancreas was normal, and the CT scan was normal with the exception of "Mild fatty infiltration of the liver."

On January 6, 2004, Plaintiff was told by his doctor to get his blood sugar under control and to stop using alcohol (R. 302).

On January 21, 2004, Plaintiff received counseling regarding the use of insulin (R. 301).

Five days later Plaintiff had not been taking his evening dose of insulin if he got home late (R. 300). He was instructed to take it as ordered.

On January 22, 2004, Plaintiff presented to the hospital with complaints of abdominal pain (R. 241). He underwent an esophagogastroduodenoscopy with biopsy which indicated "mild gastritis."

On March 9, 2004, Plaintiff said he was doing ok, "out working on sawmill." He complained of being tired (R. 299). Plaintiff said he realized "that when he went to work at his brother's sawmill

that his sugar dropped down to 91." The doctor stated: "I need to note here that Roger has called in and spoken with the staff about getting disability." The doctor "strongly encouraged [him] to get his BS under control and continue to be a productive member of society." She strongly encouraged him to avoid caffeine, nicotine, mint, chocolate and alcohol. She particularly told him that snuff contained sugar.

On March 11, 2004, Plaintiff's labs were improving (R. 296).

On April 5, 2004, Plaintiff's physician, Dr. Hammer, opined that Plaintiff had a diagnosis of insulin dependent diabetes mellitus, and his prognosis was "very good" (R. 244). He had no employment limitations, and was not disabled from work.

On May 6, 2004, Plaintiff told Dr. Hammer he had no insurance and could not get a medical card (R. 293). Dr. Henry mailed his records to the State DDS.

On May 20, 2004, Plaintiff presented to the hospital with complaints of epigastric pain and left upper quadrant pain (R. 246). He also complained of low grade fever and headaches (R. 249). Dr. Hammer noted he had not been taking all of his medications (R. 292). He had "quit his job recently and has been without insurance and therefore hasn't had all of his medications to take. He now has the medical card." He was admitted to the hospital with evidence of acute pancreatitis. CT scan of the abdomen revealed acute pancreatitis and borderline enlarged liver. His cholesterol was high as were his lipids. His discharge diagnosis was acute pancreatitis secondary to hypertriglyceridemia; hyperlipidemia with a history of hypertriglycerides; diabetes; hypertension; and acid reflux disease (R. 247).

On May 25, 2004, State agency reviewing physician Fulvio Franyutti M.D. completed an RFC, opining Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; could stand/walk

about six hours in an eight-hour day, and could sit about six hours in an eight-hour day (R. 273). He had no postural, manipulative, communicative, or visual limitations. He should avoid concentrated exposure to temperature extremes. Dr. Franyutti opined Plaintiff's RFC should be reduced to medium due to pain, hypertension, and fatigue.

On June 1, 2004, Plaintiff followed up with Dr. Hammer (R. 299). He was "feeling good since out of hosp." He was taking his medications.

On June 10, 2004, Plaintiff complained of back and neck pain "for years," and asked for a referral (R. 290). He said he had had the problem since a car wreck in 1979, and that riding in the car and mowing the lawn hurt. Upon examination there was no paraspinal tenderness of the cervical or thoracic area. He was diagnosed with neck and back pain and referred for x-rays and an MRI.

On June 29, 2004, Plaintiff presented for a cervical spine x-ray for complaints of "Neck pain" (R. 315). The x-ray showed mild degenerative changes at C4-5, 5-6, and 6-7. A thoracic spine x-ray that same date showed moderate degenerative changes within the mid and lower thoracic spine (R. 314).

On September 2, 2004, Plaintiff underwent an MRI of the cervical spine for complaints of "headache in the base of the skull and posterior head with stiffness and pain throughout the neck and also pain in the thoracic region and in the upper and lower extremities" (R. 281). The conclusion was: "There is evidence of mild cervical spondylosis, however, no severe canal or foraminal compromise is demonstrated at any level." The thoracic region had "several small disc protrusions . . . with slight cord contact . . . . No cord compression or intrinsic cord abnormality is detected."

On September 9, 2004, Dr. Hammer noted that Plaintiff "hardly ever" checked his blood sugar (R. 287). He said he used alcohol daily "basically because he can't sleep." His wife said he

10

was "drinking quite heavily at night." He complained of occasional chest pains, and that his stomach hurt off and on. He said he always had headaches. He denied any blurred vision. She noted he had "a history of not being compliant with dietary regimens in order to maintain his sugar." He continued to rub snuff. The doctor prescribed anti-inflammatories, but "he stopped taking them and didn't let me know that they weren't working for him or helping him so that we could adjust his medication accordingly."

Dr. Hammer again advised Plaintiff and his wife "regarding not using any alcohol, regarding increasing his activity, getting his BS into better control, and inspecting his feet on a daily basis." She also stressed "very strongly that it is difficult for [her] to prescribe medications if he is going to drink heavily, as he has been." She believed he might be "fighting a component of depression," and she would treat him for that, but he had "to make a commitment to get away from the alcohol."

On September 10, Plaintiff's labs came back abnormal, and Plaintiff was told that alcohol kept triglycerides high (R. 286).

On October 19, 2004, Plaintiff underwent an examination by Stephen Nutter M.D. on behalf of the State DDS (R. 332). Plaintiff claimed disability due to "Headaches, legs and back." He said he had had the problems "for a good while." He denied injury. He complained of constant pain radiating down the left leg and intermittent neck pain 4-5 days a week that did not radiate. His neck was aggravated by turning his head and rapid motion of the head and neck. He reported the neck pain caused headaches, which he got "often." He rated the headaches as a 7 on a scale of 1 to 10. It hurt the back of his head, and the light hurt his eyes when he had the headaches. They usually lasted an hour. Plaintiff also complained of his legs hurting for about three years.

Plaintiff denied drug or tobacco use, and said he drank alcohol 4-5 times a week. He last

worked in March 2004 as a well tender (R. 333). Plaintiff's visual fields were normal. His gait was normal, and he appeared comfortable supine and sitting.

Dr. Nutter diagnosed chronic back and neck pain; headaches; leg pain; and shortness of breath. He did note pain and tenderness in the cervical and dorsolumbar spine with decreased range of motion. The doctor diagnosed headaches, but also noted Plaintiff's neurological exam was normal.

On September 28, 2004, Plaintiff presented to his doctor with complaints of right side pain (R. 285). Ultrasound of the kidneys was unremarkable with the exception of a small cyst in the upper pole of the right kidney and suspicion of a tiny polyp or stone in the gallbladder.

On October 19, 2004, Plaintiff was scheduled for a cholecystectomy (R. 365).

On November 5, 2004, State reviewing physician Cynthia Osborne DO, completed an RFC, opining Plaintiff could lift 50 pounds occasionally, 25 pounds frequently, could stand/walk six hours in an eight-hour workday, and could sit about six hours in an eight-hour workday (R. 340). He had no postural, visual, manipulative, communicative or environmental limitations. She specifically noted:

> Although has pain c/o – takes no meds for pain. ADL's with assistance and is able to hunt and fish 2x/wk. Credibility is questionable. Should be capable of light level of work.

(R. 344).

On January 5, 2005, Plaintiff was examined for his right sided abdominal pain (R. 348). He was determined to have cholelithiasis, and was scheduled for a laparoscopic cholecystectomy.

X-rays of the sinuses on January 25, 2005, were normal (R. 369).

On February 7, 2005, Plaintiff had an MRI of the brain for his complaints of dizziness and

headache (R. 366). The Impression was consistent with an arachnoid cyst. There was mild flattening of the medial ventral aspect of the left temporal lobe. There was no underlying signal change, gliosis, edema, or other finding. There was no abnormal contrast enhancement. Follow-up imaging was suggested to assess the interval stability of the finding or as symptoms determined. The remainder of the brain was normal.

On March 11, 2005, Plaintiff presented to the hospital with complaints of left upper abdominal pain (R. 349). Upon examination, Plaintiff had tenderness to palpation with superficial and deep palpation in the epigastrium and left upper quadrants. There was no tenderness, rebound or guarding. The "Impression" was abdominal pain with normal amylase and slightly elevated lipase level with the pain on nonsteroidal anti-inflammatories, question pancreatitis, question co-existing peptic ulcer disease; diabetes mellitus on insulin; hyperlipidemia; and gastroesophageal reflux (GERD).

On August 1, 2005, Plaintiff presented to a Pain Clinic for his complaints of upper extremity numbness and neck and low back pain (R. 383). He reported intermittently occurring neck pain with fairly constant numbness and bilateral upper extremity pain, and intermittent low back pain with fairly constant bilateral lower extremity numbness. Upon examination Plaintiff's cervical range of motion was grossly normal for flexion, and moderately restricted for extension, left and right lateral, and left and right rotation. Sensation to light touch was diminished in the upper extremities. Strength was normal. Reflexes were diminished bilaterally in both the upper and lower extremities. Straight leg raises were negative. The Assessment was paresthesias in the distal bilateral upper and lower extremities-- consider diabetic neuropathy, and cervical strain.

In August 2005, Plaintiff underwent electrodiagnostic studies for his complaints of low back

pain and pain and numbness of the legs (R. 376). The assessment was bilateral peroneal neuropathy; bilateral tibial neuropathy; and Right S1 radiculopathy.

Plaintiff also underwent electrodiagnostic studies of the upper extremities which showed bilateral carpal tunnel syndrome and mild diabetic neuropathy (R. 379). He was to wear splints on both hands at nighttime.

At the Administrative Hearing in August 2005, Plaintiff testified that he had been on arthritis medication but it was thought that the medication might be causing his pancreatitis, so he was taken off it (R. 420).

Plaintiff also testified that he had severe headaches in the back of his head (R. 420). He got the really bad headaches eight to ten times a month, and they could last three to four hours. His doctors did a brain scan and found a cyst, but had not as yet done anything further. They did not give him any medication, just suggesting he take Tylenol.

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act through December 31, 2007.

2. The claimant has not engaged in substantial gainful activity since March 8, 2004 (20 CFR §§ 404.1520(b) and 416.920(b).

3. The claimant has the following severe impairments: bilateral carpal tunnel syndrome, borderline intellectual functioning, diabetes mellitus, and degenerative changes of the cervical and lumbar spine (20 CFR §§ 404.1520(c)and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404,

14

Subpart P, Appendix 1, Regulations No. 4 (20 CFR §§ 404.1529(d) and 416.920(d)) and not otherwise contended.

5.  Upon careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the exertional requirements of light work. Specifically, he can sit for six hours in an 8-hour workday, stand and walk for six hours in an 8-hour workday and lift twenty pounds occasionally and ten pounds frequently from an exertional standpoint due to his impairments. Nonexertionally, his pain is not so significant as to interfere with the ability to understand, remember and carry out simple, routine unskilled tasks and move about freely. Due to intermittent episodes of dizziness and blurred vision, he should avoid working around heights and moving machinery. He can occasionally climb and balance. He needs to avoid concentrated exposure to vibration. He should not engage in close, detailed visual inspection work.

6.  The claimant is unable to perform any past relevant work (20 CFR §§ 404.1565 and 416.965).

7.  The claimant was born on November 15, 1958 and was 45 years old on the alleged disability onset date, which is defined as a younger individual age 45-49 (20 CFR §§ 404.1563 and 416.963).

8.  The claimant has a seventh grade education and is able to communicate in English (20 CFR §§ 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR §§ 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR §§ 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from March 8, 2004 through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(R. 20-21).

## IV. Contentions

A.   Plaintiff contends:

    1.    The Commissioner's decision is not based on substantial evidence as the ALJ improperly concluded Smith's headaches were under control and were not a medically determinable impairment; and

    2.    The Commissioner's decision is not based on substantial evidence as the ALJ committed reversible error in finding Smith not credible.

B.   Defendant contends substantial evidence supports the ALJ's finding that Plaintiff was not fully credible and could perform a significant number of jobs.

## V. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Headaches

Plaintiff first argues that the ALJ improperly concluded his headaches were under control and were not a medically determinable impairment. Upon review of the record, it appears Plaintiff first complained of headaches in March 1999, with sinus trouble. In June 1999, Plaintiff complained of headache and vertigo. He had sinus x-rays which were normal. In July 1999, an MRI of the cervical spine showed mild early disc dessication with no HNP, stenosis or significant foraminal narrowing. In February 2003, Plaintiff stated that he fell at work, injuring his neck and shoulder. He had neck and shoulder pain as well as headaches in the back of his head. On March 17, 2003, Plaintiff complained of sinus trouble and headache in the front of his head. On March 27, he complained of headaches, in the back of his neck and head, but he was not taking anything for them, was just letting them pass. In December 2003, Plaintiff complained of severe pain from a sinus infection. In May 2004, Plaintiff complained of fever and headache. In June 2004, Plaintiff complained of back and neck pain for years. Cervical spine x-rays showed mild degenerative changes at C4-5, 5-6, and 6-7, with moderate degenerative changes in the thoracic spine. In September 2004, Plaintiff complained of headache in the base of his skull with stiffness and pain in the neck. X-rays showed mild cervical spondylosis. On September 9, 2004, Plaintiff stated he "always had headaches." In October 2004, Plaintiff complained of headaches, and leg and back pain. He said neck pain caused him to have headaches often, which he ranked as seven on a scale of one to ten for pain. The pain was in the back of his head. Dr. Nutter diagnosed neck pain and tenderness in the cervical spine plus headaches, although he noted Plaintiff's neurological examination was normal. A February 2005, MRI for Plaintiff's complaints of headache and dizziness indicated the presence of an arachnoid cyst. It was advised that Plaintiff have more tests to determine whether the cyst was growing and whether it was symptomatic.

17

At the administrative hearing, Plaintiff testified he had severe headaches in the back of his head eight to ten times per month, which lasted three to four hours. The doctors had not done anything yet, suggesting he use Tylenol. He was supposed to see another doctor regarding the arachnoid cyst, but had not yet been scheduled to see anyone.

Defendant argues:

Despite complaints of headaches, the ALJ properly found these not to be a medically determinable severe impairment. Dr. Paroda noted that neurologically, Plaintiff was grossly intact without any focal deficits. Dr. Nutter's 2004 examination also showed that Plaintiff was neurologically normal with no focal deficits. Although a February 2005 MRI of Plaintiff's brain showed an arachnoid cyst, there was no underlying signal change, gliosis, edema, or other finding. Importantly, Plaintiff took no medication for his alleged headaches and just "lets it pass."

Plaintiff counters that there are at least three possible causes of his severe headaches– his cervical and thoracic spine degeneration, his sinus cyst and arachnoid cyst.

Regarding Plaintiff's alleged headaches, the ALJ stated:

While the claimant alleges problems with hypertension and headaches, a review of the medical record indicate[] that his condition is controlled with medication and ongoing medical care. Nor does the record reflect any limitation of his daily activities, social functioning, or concentration due to hypertension. His headaches are not determinable. It is therefore concluded that his alleged hypertension has no more than a minimal effect on his ability to function and as such is "not severe."

It appears to the undersigned that the ALJ determined Plaintiff's headaches, if any, were caused only by his hypertension. The record does not reflect this, however, as it shows several possible causes of headaches. Notably, Plaintiff's treating physicians sent him for various tests for his complaints of headache. He was diagnosed with headaches. Significantly, a February 7, 2005, MRI of the brain was consistent with an arachnoid cyst. The undersigned does not speculate as to whether this arachnoid cyst caused Plaintiff's alleged headaches, or even if Plaintiff actually did have

18

medically determinable headaches, but notes that Plaintiff fairly consistently complained of headache in the back of his head at the base of his skull, which is consistent with headaches caused by either his cervical spine impairment or by an arachnoid cyst.

The National Institute of Neurological Disorders and Stroke ("NINDS"), a part of the government's National Institute for Health ("NIH"), defines an arachnoid cyst as a cerebrospinal fluid filled sac located between the brain or spinal cord and the arachnoid membrane. Further, typical symptoms of an arachnoid cyst around the brain include headache, visual disturbances, and vertigo, all symptoms about which Plaintiff complained. www. Ninds.nih.gov/disorders/arachnoid_cysts/arachnoid_cysts.htm.

The ALJ stated he considered all the Plaintiff's symptoms in accordance with the regulations and rulings. He also stated he considered opinion evidence in accordance with the requirements of the regulations and rulings and gave "significant weight to State Agency non-treating examiners regarding the claimant's ability to work. These statements are consistent with the medical evidence overall and consistent with the claimant's activities of daily living and his treatment." There is, however, no State Agency examiner opinion or examination subsequent to the finding that Plaintiff had an arachnoid cyst. The last State Agency examination prior to the brain MRI was in October 2004, performed by Dr. Nutter, who did, in fact, diagnose Plaintiff with headaches.

The undersigned cannot determine that substantial evidence supports the ALJ's determination that Plaintiff's headaches were not medically determinable where there are objective studies documenting a possible cause for the headaches, yet the State Agency physicians on whom the ALJ relies had not had the advantage of the studies before completing their opinions.

## C. Credibility

Plaintiff next argues the Commissioner's decision is not based on substantial evidence as the

ALJ committed reversible errors in finding Plaintiff not credible. Regarding credibility, the ALJ stated:

> Upon considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms. However, the claimant's statement concerning the intensity, duration and limiting effects of these symptoms are not entirely credible.

The ALJ did not find Plaintiff's alleged headaches to be a medically determinable impairment. The undersigned has already found that this finding was not supported by substantial evidence. Other than that finding, the ALJ did not address why Plaintiff's statements regarding headaches was not credible. For this reason alone, the undersigned finds substantial evidence does not support the ALJ's determination that Plaintiff was not credible. As already noted, there is objective medical evidence which may support Plaintiff's claim of allegedly severe headaches. There is no medical evidence that shows he does not have these headaches, as the State agency physicians upon whom the ALJ relies all completed their opinions prior to the brain MRI which showed the arachnoid cyst. None, therefore, considered this condition in fashioning his or her opinion or RFC.

The undersigned therefore finds substantial evidence does not support the ALJ's finding that Plaintiff was not entirely credible.

## VI. RECOMMENDATION

For the reasons herein stated, I find that substantial evidence does not support the Commissioner's decision denying Plaintiff's applications for SSI and DIB. I accordingly recommend Defendant's Motion for Summary Judgment [D.E. 11] be **DENIED;** Plaintiff's Motion for Judgment on the Pleadings [D.E. 10] be **GRANTED in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to

the Commissioner for further proceedings consistent and in accord with this Recommendation; and this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to Chief United States District Judge Irene M. Keeley. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 27 day of June, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE